IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 1, 2019

IN RE H.S.

**Appeal from the Juvenile Court for Williamson County**
**No. 35799          Sharon Guffee, Judge**

_____

**No. M2019-00808-COA-R3-PT**

_____

The Department of Children's Services filed a petition to terminate the parental rights of E.R. (mother) and T.S. (father) with respect to H.S. (the child). The trial court found clear and convincing evidence to terminate mother and father's parental rights on multiple grounds. By the same quantum of proof, the court determined that termination of mother and father's parental rights is in the best interest of the child. Only mother appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court in which CARMA DENNIS MCGEE, J., joined. ANDY D. BENNETT, J., filed a separate opinion concurring in part and dissenting with respect to Part IV.C of the majority opinion.

Jennifer L. Honeycutt, Franklin, Tennessee, for the appellant, E.R.

Herbert H. Slatery, III, Attorney General and Reporter, and Jordan K. Crews, Assistant Attorney General, Tennessee, for the appellee, Tennessee Department of Children's Services.

Karen Johnson, Brentwood, Tennessee, Guardian Ad Litem.

**OPINION**

**I.**

A bench trial took place on February 11, February 13, March 25, and April 17, 2019. The court heard testimony from mother, father, foster mother, Tamera Stamps (a DCS family service worker), Katie Nabors (a DCS social services team leader), Amy

Finnegan (a court-appointed special advocate), and Khylee Harshman (a resource coordinator for Omni Visions, which provided supervised visitation).

At the time of trial, mother and father had known one another for about eleven years. They were romantically involved "for a while" but experienced several break-ups. H.S. is the youngest of their four children.[1] Last year, this Court affirmed the termination of mother and father's parental rights with respect to the three older children. ***In re Trey S.***, No. M2018-01979-COA-R3-PT, 2019 WL 2539204 (Tenn. Ct. App., filed June 20, 2019).

In June 2016, before H.S. was born, DCS received a referral stating that the three older children were exposed to drugs and suffering from various kinds of neglect. At the time, mother and the three older children were living in a domestic violence shelter. According to Ms. Finnegan, mother said that she and father "had a history of fighting" and "that there were several black eyes." Mother said that she checked into the shelter after father pushed her down and her face hit the footboard of their bed. At the shelter, mother tested positive for methamphetamine, amphetamine, and buprenorphine. Mother admitted to using cocaine a few weeks earlier.

On June 20, 2016, the three older children were removed from mother and father's custody and placed in a foster home. Mother and father entered into a permanency plan with DCS. For several months, they completed many of the plan's requirements. Both parents were passing drug screens. In December 2016, mother began treatment at a Suboxone clinic in order to eliminate her dependence on opiates.

H.S. was born on May 16, 2017. Just a couple of weeks later, the three older children were returned to mother and father for a trial home placement. During the trial home placement, mother inadvertently called Ms. Finnegan and left a message on her phone. According to Ms. Finnegan, mother was screaming and swearing at the children. When Ms. Finnegan visited the home the following day, mother stated that she was "super anxious and overwhelmed" because she was not getting enough help from family members. Mother also expressed concern that father may have been using drugs. Everyone in the home had lice. The three older children were fighting with one another. Ms. Finnegan testified that she had "just never seen them act that way when they were in their resource home." Social workers tried to help mother enroll the three older children in a summer day camp. Before that could be arranged, the trial home placement was terminated due to parents' criminal behavior. Father was arrested for manufacturing large quantities of controlled substances. Mother tested positive for methamphetamine.

On July 6, 2017, all four children were removed from parents' custody. The three older children returned to the foster home. The foster parents initially declined to accept

---

[1] Mother also has two adult sons.

custody of H.S. because they were concerned about not having enough space. Pursuant to an "immediate protection agreement," H.S. was placed with father's eighteen-year-old cousin, who was living with another relative.

On July 11, 2017, DCS filed a petition to adjudicate dependency and neglect. Mother and father waived the preliminary hearing. On July 20, 2017, the trial court entered an order which provided that the immediate protection agreement would remain in effect pending further orders from the court. The court also instructed the parties to ensure that the child was safe in her current placement. On September 12, 2017, the child was adjudicated dependent and neglected because of her proximity to substance abuse and domestic violence. After the adjudicatory hearing, the child was placed in the same foster home as her three older siblings.

At trial, foster mother testified that she and her husband moved into a five-bedroom home that could accommodate all four children. Foster parents "absolutely" want to adopt H.S. and her siblings. Foster mother testified that the three older children are "very protective" of H.S. and have a "very deep bond." The older siblings taught H.S. to call foster parents "mom" and "dad." According to foster mother, the older children "would ask us regularly if [H.S.] was safe[.]" One child said that during the trial home placement mother and father were fighting and busted down a door that landed next to H.S.'s bed.

In August 2017, mother tested positive for methamphetamine. She also moved into a trailer. Aside from the trailer's close proximity to an abandoned, unfinished home, there are no environmental concerns. In September 2017, mother and father attended a county fair with some friends. Afterward, there was a physical altercation, which resulted in father's arrest on domestic violence charges.[2] Mother drank so much alcohol that day that she could not remember important details about the incident. In October 2017, mother missed a drug screen. In November 2017, she tested positive for methamphetamine.

In December 2017, DCS filed a petition to terminate mother and father's parental rights with respect to the three older children. Following a bench trial, the court entered an order terminating mother and father's parental rights to the three older children. Both parents appealed, but this Court affirmed. **In re Trey S.**, 2019 WL 2539204, at *21. DCS filed a petition to terminate mother and father's parental rights to H.S. on October 24, 2018.

In the months leading up to the filing of the petition, mother made some positive steps toward regaining custody of H.S. For example, mother obtained stable

---

[2] Those charges were eventually dropped.

employment, made regular child support payments, attended all supervised visitation, passed drug tests and pill counts, completed an alcohol and drug assessment, attended individual counseling, and completed parenting classes.

However, mother did not abstain from alcohol, as recommended by her alcohol and drug assessment. Instead, mother's alcohol consumption increased, especially after the termination of her parental rights with respect to the three older children. Mother admitted that she began drinking at home whenever she was feeling "upset" and "defeated." At times, she "felt like [she] couldn't breathe." The frequency and volume of mother's alcohol consumption depended on "how bad [she] fe[lt]" on a particular day.

On June 21, 2018, Ms. Finnegan conducted a home visit around 11:00 a.m. Ms. Finnegan thought she smelled alcohol on mother's breath. In July 2018, mother appeared for a court hearing with a blood alcohol content of 0.12. Mother also tested positive for alcohol at another court hearing in November 2018. Mother admitted that she began drinking more in the months leading up to trial. When asked if she had turned to alcohol as a coping mechanism, mother responded, "I don't even know how I'm coping. . . . I don't think I'm coping at all, but I'm just trying to get through it." Mother said her doctor was more concerned about her mental health than her consumption of alcohol. At the time, mother had a prescription for two anti-anxiety medications – Celexa and Vistaril. Mother testified that she felt like the medication was working, but she admitted that she still felt "real anxious." Mother was also still taking Suboxone.

Additionally, mother did not have a reliable form of transportation because her driver's license was suspended. Although mother was able to arrange transportation to work and visits with the children, it is clear that father has been at least one source of her transportation, because father drove mother to court twice during the trial.

Mother and father never completed couples counseling, which was required by the permanency plan if mother and father intended to stay together. Several witnesses characterized mother and father's romantic relationship as "on-again off-again." According to Ms. Stamps, mother "would say that she doesn't want to be with [father], but then within the same conversation, she had mentioned, well, she would be open to doing counseling with him for the kids." In September 2017, mother and father attended a county fair together, which led to father's arrest on domestic violence charges. In January 2018, at a foster care review board meeting, father expressed his desire to reunite with mother; mother was "noncommittal." Ms. Finnegan testified that in January 2019, mother's Facebook account indicated that father was "spending the night [with mother] just recently until she found out that he was cheating on her again[.]" Mother denied it, claiming that her Facebook account was hacked. Father admitted that he and mother have had sex "a few times" since H.S. was removed, but he denied spending the night with mother shortly before trial. Father also testified:

I'm always going to be in her life. I mean, whether together or not, I'm going to help her if I can. It doesn't mean we're in a relationship, but if she needs my help, I'll be there for her.

On March 12, 2019, during the middle of trial, mother checked herself into an in-patient treatment facility. Mother returned to court on April 17, 2017, for the last day of trial. Mother testified that she completed the rehabilitation program and would not test positive for drugs or alcohol. Mother also testified that she had plans to continue treatment for eighteen months at another facility in Alabama. Mother said that she "just want[s] to start over" and that she "want[s] to get away from everybody that's on drugs, Suboxone, anything." According to mother, the Alabama treatment facility would allow her to move into a sober living home after thirty to forty-five days. At that point, she would be allowed to keep children. Mother testified that maternal grandmother was willing to keep H.S. until mother could move into the sober living home. Mother also testified regarding various changes in her medication. She had weaned herself off Suboxone and had changed her anti-anxiety medications. At the end of trial, mother testified as follows:

It feels great. Even if – even if I don't get [H.S.] back or win the appeal, I mean, I want to be better for them when they – if they find me when they're 18 or if I get to see them, if the [foster parents] decide I get to. I just want to be better, regardless of the outcome of this.

The trial court commended mother for her progress and encouraged her to continue seeking appropriate treatment. Ultimately, however, the court entered an order terminating mother and father's parental rights. Mother timely appealed.

## II.

Mother raises the following issues:

Whether the trial court properly determined that grounds existed to terminate [m]other's parental rights.

Whether the trial court properly determined that termination of [m]other's parental rights was in the best interest of the child.

## III.

A parent has a fundamental right, based on both the federal and state constitutions,

to the care, custody, and control of his or her child. ***Stanley v. Ill.***, 405 U.S. 645, 651 (1972); ***In re Angela E.***, 303 S.W.3d 240, 250 (Tenn. 2010); ***Nash–Putnam v. McCloud***, 921 S.W.2d 170, 174-75 (Tenn. 1996). Although this right is fundamental, it is not absolute. The State may interfere with a parent's rights in certain circumstances. ***In re Angela E.***, 303 S.W.3d at 250. Our legislature has listed the grounds upon which termination proceedings may be brought. Tenn. Code Ann. § 36-1-113(g) (Supp. 2019). Because termination proceedings are statutory, ***In re Angela E.***, 303 S.W.3d at 250; ***Osborn v. Marr***, 127 S.W.3d 737, 739 (Tenn. 2004), a parent's rights may be terminated only where a statutory basis exists. ***Jones v. Garrett***, 92 S.W.3d 835, 838 (Tenn. 2002); ***In the Matter of M.W.A., Jr.***, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

To terminate parental rights, a court must determine by clear and convincing evidence the existence of at least one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); ***In re Valentine***, 79 S.W.3d 539, 546 (Tenn. 2002). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." ***In re Bernard T.***, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted). Unlike the preponderance of the evidence standard, "[e]vidence satisfying the clear and convincing standard establishes that the truth of the facts asserted is highly probable." ***In re Audrey S.***, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005).

Once a ground for termination is established by clear and convincing evidence, the trial court conducts a best interest analysis. ***In re Angela E.***, 303 S.W.3d at 251 (citing ***In re Marr***, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005)). "The best interest[ ] analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." ***Id.*** at 254. The existence of a ground for termination "does not inexorably lead to the conclusion that termination of a parent's rights is in the best interest of the child." ***In re C.B.W.***, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App., filed June 26, 2006).

We are required to review all of the trial court's findings with respect to grounds and best interest. ***In re Carrington***, 483 S.W.3d 507, 525-26 (Tenn. 2016) ("[W]e hold that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination[ is in the child's best interest[ ], regardless of whether the parent challenges these findings on appeal.").

The Tennessee Supreme Court has stated our standard of review:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review

factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*Id.* at 523-24 (internal citations omitted). "When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to . . . the trial court's factual findings." *In re Adoption of S.T.D.*, No. E2007-01240-COA-R3-PT, 2007 WL 3171034, at *4 (Tenn. Ct. App., filed Oct. 30, 2007) (citing *Seals v. England/Corsair Upholstery Mfg. Co., Inc.*, 984 S.W.2d 912, 915 (Tenn. 1999)).

## IV.

The trial court found clear and convincing evidence to terminate mother's parental rights on three grounds: (A) abandonment by failure to provide a suitable home; (B) persistent conditions; and (C) failure to manifest an ability and willingness to assume custody of the child. We discuss each ground in turn.

## A.

Tennessee law allows for the termination of parental rights on the ground of abandonment. Tenn. Code Ann. § 36-1-113(g)(1). A parent can abandon a child in several ways, including by failing to provide a suitable home. In order to terminate mother's parental rights on this ground, DCS was required to present clear and convincing evidence of the following elements:

> (a) The child has been removed from the home or the physical or legal custody of a parent . . . by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the

department or a licensed child-placing agency;

(b) The juvenile court found . . . that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

(c) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent . . . to establish a suitable home for the child, but that the parent . . . ha[s] not made reciprocal reasonable efforts to provide a suitable home and ha[s] demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent . . . in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent . . . toward the same goal, when the parent . . . is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii) (effective July 1, 2018 to March 21, 2019).[3]

With respect to section (a), it is undisputed that, on July 6, 2017, the child was removed from mother's custody and placed with a family member pursuant to an immediate protection agreement. On July 11, 2017, DCS filed a petition to adjudicate dependency and neglect. The court entered an order on July 20, 2017, which provided, in part, that "The Immediate Protection Agreement shall remain in effect pending further orders of the Court." After an adjudicatory hearing on September 12, 2017, the child entered DCS custody and was placed in a foster home.

With respect to section (b), the trial court made the following findings:

The Department made reasonable efforts to prevent the removal of this child by providing services to both parents in the open case with the child's older siblings who were on a trial home placement with both parents at the time of the removal. Those services included developing permanency plans, drug screens for both parents, parenting classes, clinical assessment, and domestic violence classes.

---

[3] We apply the statute in effect when the petition to terminate parental rights was filed.

Most of the services identified by the court were provided to the parents before H.S. was born. These services are examples of DCS's reasonable efforts to prevent the removal of the three older children, not H.S. Nevertheless, the requirements of section (b) are still satisfied because father's arrest and mother's use of methamphetamine during the trial home placement constitute "circumstances . . . [that] prevented reasonable efforts from being made prior to the child's removal[.]" Tenn. Code Ann. § 36-1-102(1)(A)(ii)(b). Mother basically conceded this point when she and father entered into an immediate protection agreement, which allowed a family member to obtain custody of H.S.

With respect to section (c), the trial court made the following findings:

> The four month period after the removal of the child is July 18, 2017 to November 18, 2017. The Department made reasonable efforts to assist the parents in establishing a suitable home by continuing to drug screen parents, including providing hair follicle tests, non self-reporting alcohol and drug assessments, doing pill counts, parenting assessment and parenting education, individual counseling and clinical assessment. The department was ready to provide couples counseling for parents but w[as] unable to determine if the parents were together throughout the course of this case.

> *     *     *

> Mother has made some reasonable efforts to establish a suitable home for the child during the four month period after removal in that she has maintained contact with DCS and had a stable address. She continued her substance abuse treatment during this time with her suboxone clinic. However, she tested positive in August and November 201[7] for meth, began abusing alcohol as evidenced by the incident at the fair in September 201[7] and continued to increase her alcohol abuse as this progressed.

> Mother's efforts do not demonstrate a lack of concern for the child to the same extent as Father but the reality is, Mother's alcohol abuse (evidenced by coming to court under the influence in July 2018 and admitting to increased alcohol abuse up until the date of trial) has prevented Mother from providing a suitable home *at an early date*. Even with Mother's recent (during the trial) in-patient treatment, she has a long way to go to maintain consistent sobriety.

- 9 -

The Court finds the efforts by the Department exceed those efforts by Mother towards providing a suitable home.

(Emphasis in original.)

The evidence preponderates in favor of the trial court's finding that DCS made reasonable efforts to assist mother in establishing a suitable home during the four-month period identified by the court.[4] Mother offers no argument to the contrary and for good reason. We have long held that providing drug screens, maintaining consistent communication with a parent, coordinating alcohol and drug assessments, and offering counseling services constitute reasonable efforts to assist a parent in establishing a suitable home. *See, e.g.*, **In re Nevada N.**, 498 S.W.3d 579, 596 (Tenn. Ct. App. 2016). At the very least, DCS's efforts "equal or exceed the efforts of [mother.]" *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c). From July 18, 2017, to November 18, 2017, mother failed drug screens, failed to start couples counseling, and continued to associate with father despite a history of substance abuse and domestic violence. *Cf.* **In re Hannah H.**, No. E2013–01211–COA–R3–PT, 2014 WL 2587397, at *9 (Tenn. Ct. App., filed June 10, 2014) (quoting **State v. C. W.**, No. E2007–00561–COA–R3–PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007) ("A 'suitable home requires more than a proper physical living location.' It requires that the home be free of drugs and domestic violence.")).

The evidence also preponderates in favor of the trial court's finding that mother has made some reasonable efforts to provide a suitable home but has still "demonstrated a lack of concern for the child to such a degree that it appears unlikely that [she] will be able to provide a suitable home for the child at an early date." Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c). Like the trial court, we commend mother for her recent decision to seek additional treatment for her substance abuse and mental health issues. Nonetheless, the court appropriately ruled that mother's sobriety on the last day of trial is not enough to show that mother will be able to provide a suitable home "at an early date." *Compare* **In re L.J.**, No. E2014–02042–COA–R3–PT, 2015 WL 5121111, at *7 (Tenn. Ct. App., filed Aug. 31, 2015) (holding that mother's ability to obtain housing two weeks before the final trial date was "too little, too late" and did not demonstrate mother's ability to provide a suitable home "at an early date"), *with* **In re Serenity W.**, No. E2018-00460-COA-R3-PT, 2019 WL 511387, at *5 (Tenn. Ct. App., filed Feb. 8, 2019) (holding that mother demonstrated that she could provide a suitable home "at an early date" because she had completed multiple rounds of rehabilitation, attended counseling, and "had been

---

[4] As we have explained in other cases, the statute under present consideration "does not limit the window during which DCS may satisfy its obligation to make reasonable efforts to the four-month period directly following statutory removal." **In re Jakob O.**, No. M2016–00391–COA–R3–PT, 2016 WL 7243674, at *13 (Tenn. Ct. App., filed Sept. 20, 2016).

drug free for several months"). Accordingly, we hold that there is clear and convincing evidence to terminate mother's parental rights on this ground.

**B.**

Tenn. Code Ann. § 36-1-113(g)(3) provides for the termination of parental rights on the ground of persistent conditions. When the petition to terminate parental rights was filed, the statute required a petitioner to present clear and convincing evidence of the following circumstances:

> (A) The child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>
> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent . . . or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent . . . ;
>
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and
>
> (iii) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

Tenn. Code Ann. § 36-1-113(g)(3)(A) (effective July 1, 2018 to June 30, 2019). The purpose of allowing the termination of parental rights under these circumstances is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re Dakota C.R.*, 404 S.W.3d 484, 499 (Tenn. Ct. App. 2012) (citations omitted). "The failure to remedy the conditions which led to the removal need not be willful." *Id.*

It is undisputed that the child has been removed from the home of mother for more than six months and that removal was due to the child's proximity to substance abuse and domestic violence. In her brief, mother argues that "all conditions have been remedied." Once again, mother emphasizes the fact that she recently completed in-patient

- 11 -

rehabilitation and was sober on the last day of trial. Mother concedes that she and father never completed couples counseling. However, mother argues that DCS failed to produce clear and convincing evidence that mother and father were currently in a romantic relationship or would likely resume their romantic relationship in the future.

The trial court ruled that "both parents' substance abuse is the main reason the child would be subject to further abuse and neglect." The court's order sets forth a detailed summary of mother's "six year pattern of serious drug use of multiple controlled substances[,] including cocaine (injected for a year), opiates (oxycodone, opana), methamphetamine[,] and most recently, alcohol." After reciting mother's extensive history of substance abuse, the court again acknowledged mother's recent attempts to achieve sobriety; nevertheless, the court concluded that "it will likely take a long period of sobriety before [mother] is in a healthy place."

The trial court stated that "it does not appear the parents are currently together," but the court expressed concern that mother and father never completed couples counseling and continued to associate with one another. Specifically, the court noted the fact that father has provided mother with transportation. Father also testified that he would always be in mother's life.

Finally, the trial court found that continuation of the parent-child relationship would greatly diminish the child's chances of early integration into a safe, stable, and permanent home. The court noted that the child has been in the custody of the foster parents since she was three months old. Mother has never had unsupervised time with the child. By all accounts, the child is bonded to her siblings and is thriving in the foster home. The foster parents already have custody of the siblings and intend to adopt them. Continuation of the parent-child relationship would deny H.S. the opportunity to enjoy the same stability as her siblings.

The evidence preponderates in favor of the trial court's finding that the conditions which led to the child's removal still persist. With respect to substance abuse, "Mother seems to have substituted alcohol for drugs, and Mother has not presented evidence showing that she has addressed her struggles with alcohol." *In re Trey S.*, 2019 WL 2539204, at *14. As previously discussed, being sober on the last day of trial is not enough. With respect to the threat of domestic violence, the evidence is a bit weaker. It is undisputed that mother and father never attended couples counseling and continued to be romantically involved during the early stages of this case; however, it is unclear whether mother and father have been romantically involved in the months leading up to trial or whether they will resume their relationship in the future. Both parents testified that they were not in a relationship and that any future contact would not be romantic in nature. However, it seems that the trial court has made an implicit credibility

determination to the contrary.[5]  *See In re Wyatt S.*, No. E2012–00539–COA–R3–JV, 2012 WL 5482215, at \*9 (Tenn. Ct. App., filed Nov. 13, 2012) (implicit credibility determination);  *Taylor v. McKinnie*, No. W2007-01468-COA-R3-JV, 2008 WL 2971767, at \*4 (Tenn. Ct. App., filed Aug. 5, 2008) (implicit credibility determination). Because the trial court had the opportunity to observe the parents' in-person testimony, we will not disturb that credibility determination.

For the reasons discussed in the previous section of this opinion, the evidence also preponderates in favor of the court's finding that there is little likelihood that these conditions will be remedied "at an early date" such that it would be safe to return the child to mother.  Given the child's close bond with the foster parents and her siblings, as well as mother's limited interactions with the child, the evidence also preponderates in favor of the court's finding that continuation of the parent-child relationship will greatly diminish the child's chances of early integration into a safe and stable home.

We hold that the facts found by the trial court amount to clear and convincing evidence that mother's parental rights can be terminated on the ground of persistent conditions.

## C.

Finally, the trial court found grounds to terminate mother's parental rights because the court determined that there was clear and convincing evidence that mother

> failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in [mother's] legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14).  As we have previously explained,

> this ground requires DCS to prove two elements by clear and convincing evidence.  Tenn. Code Ann. § 36–1–113(c)(1), (g)(14).  First, DCS must prove that Mother failed to manifest "an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren]."  Tenn. Code Ann. § 36–1–113(g)(14).  DCS must then prove

---

[5] In the prior termination proceeding involving these parents, the same trial judge made an express credibility determination:  "The Court cannot believe a single word either of these parents say in regards to their relationship or their substance abuse." *In re Trey S.*, 2019 WL 2539204, at \*13.

that placing the children in Mother's "legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[ren]." *Id.*

*In re Maya R.*, No. E2017–01634–COA–R3–PT, 2018 WL 1629930, at *7 (Tenn. Ct. App., filed Apr. 4, 2018).

With regard to the first element, the trial court determined that "[w]hile Mother has indicated a willingness to assume custody of the child by visiting and completing many of the tasks on the permanency plan, she has not shown an *ability* to assume custody due to her substance abuse." (Emphasis in original.) The court reiterated that mother's substance abuse, particularly her dependence on alcohol, makes her unable to assume custody of the child.

There is a split of authority as to whether parental rights can be terminated on this ground when a parent has manifested a willingness, but not the ability, to assume custody of a child. *Compare In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *12-14 (Tenn. Ct. App., filed June 20, 2018) (termination allowed), *no perm. app. filed*, and *In re Neamiah R.*, No. E2017-02000-COA-R3-PT, 2018 WL 2331868, at *7 (Tenn. Ct. App. May 23, 2018) (termination allowed), *no perm. app. filed*, with *In re Ayden S.*, No. M2017–01185–COA–R3–PT, 2018 WL 2447044, at *7 (Tenn. Ct. App., filed May 31, 2018) (termination not allowed), *no perm. app. filed*. DCS asks us to follow the holding of *In re Amynn K.*, in which this Court held that parental rights *can* be terminated if the petitioner shows that a parent has failed to manifest an ability to assume custody of a child, despite having a willingness to do so. 2018 WL 3058280, at *12-14.

After careful consideration of the conflicting authorities, we accept DCS's invitation to follow the holding of *In re Amynn K*. In that case, the Court carefully applied well-established rules of statutory construction. The Court's interpretation of Tenn. Code Ann. § 36-1-113(g)(14) also closely parallels the Supreme Court's interpretation of Tenn. Code Ann. § 36-1-113(g)(9)(A)(iv), a similarly-worded ground for terminating a putative father's parental rights.[6] *See In re Bernard T.*, 319 S.W.3d 586, 604-05 (Tenn. 2010) (concluding that the ground was proven where the father had "manifested a commendable willingness to assume legal custody of all the children" but did not "presently have the ability to assume legal and physical custody of any of the children.").

Returning to the present case, the evidence preponderates in favor of the trial court's finding that mother was willing, but not able, to assume custody of the child.

---

[6] Under this ground, a putative father's parental rights can be terminated when: "The person has failed to manifest an ability and willingness to assume legal and physical custody of the child[.]" Tenn. Code Ann. § 36-1-113(g)(9)(A)(iv).

Mother has complied with many requirements of the permanency plan. She even checked herself into an in-patient treatment facility during the middle of trial. These actions, as well as mother's testimony, indicate that she is willing to assume custody of H.S. Nevertheless, as already discussed in this opinion, mother did not have the ability to assume custody of the child at the time of trial.

With regard to the second element of this ground, the trial court stated the following:

> "The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human contact. However, the use of the modifier 'substantial harm' indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not." *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001).
>
> The Court has no trouble at all finding that placing the child in Mother's legal and physical custody at this time would pose a risk of substantial harm to the physical or psychological welfare of the child. Mother does not have a period of sustained sobriety for many, many years. Even before her older children were placed in DCS custody in 2016, she was abusing drugs for several years.
>
> Based on Mother's history of substance abuse and collateral criminal activity, the likelihood of a relapse is extremely high and poses a risk of substantial harm to this child. While the Court is hopeful Mother is able to continue her treatment and be successful in her sobriety for her own well-being, it is not likely this will happen in the near future to benefit this child.

Mother's brief contains the conclusory assertion that DCS failed to prove that returning the child to mother would pose a risk of substantial harm. No explanation is provided. In our view, the evidence preponderates in favor of the trial court's finding that the child would be at risk of substantial harm because of mother's pattern of substance abuse. Additionally, Ms. Harshman, a resource coordinator for Omni Visions, testified that it would be "traumatic" for the child to be removed from the home of her

- 15 -

foster parents and her siblings. This is the only home H.S. has ever known. The psychological harm that would result from her removal is at least as important as the potential physical harm that could be caused by the child's proximity to substance abuse.

We agree with the trial court that the foregoing facts clearly and convincingly support termination of mother's rights pursuant to Tenn. Code Ann. § 36-1-113(g)(14).

## V.

## A.

Because at least one statutory ground warrants the termination of mother and father's parental rights, we now focus on whether termination is in the best interest of H.S. We are guided by the statutory factors set forth in Tenn. Code Ann. § 36-1-113(i):

> In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interests to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward

- 16 -

the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

"Ascertaining a child's best interests does not call for a rote examination of [these] nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case." *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005). Most importantly, "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective." *In re Marr*, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005) (citing *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004)).

**B.**

The trial court expressly considered the factors recited above. Because the court's findings are supported by the record, we quote at length from the court's discussion[7]:

> (1) *Whether the parent has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent.*
>
> \*     \*     \*
>
> MOTHER: While Mother has made some good progress on the requirements asked of her, she continues to struggle with substance abuse to the extent that it is unsafe for the child to be returned to her home. Since this is the paramount reason

---

[7] We omit the court's consideration of the best interest factors as they relate to father.

the child was placed into foster care, it is the priority outcome that is missing from Mother's circumstances. It remains unclear whether she will be able to make a lasting adjustment in the near future. This uncertainty is what the child is trapped in.

The Court places great weight on this factor for finding termination is in the [child's] best interest.

(2) *Whether the parent has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible.*

\* \* \*

MOTHER: DCS has assisted with numerous random drug screens and payment of hair follicle tests and an alcohol and drug assessment for Mother (September 2017). The Department provided a clinical assessment for Mother and parenting assessment. They provided supervised visitation both through a provider agency and DCS caseworkers for two and a half years. They have maintained constant contact with Mother and provided support for her whenever necessary. Despite all of this, Mother continues to struggle with substance abuse, substituting alcohol for drugs as recently as during the trial.

(3) *Whether the parent has maintained regular visitation or other contact with the child.*

\* \* \*

MOTHER: Mother has consistently visited with the child during the entirety of the case. However, Mother has not had unsupervised visits or overnight visits and there were no recent recommendations that she have this.

(4) *Whether a meaningful relationship has otherwise been established between the parent and the child.*

\* \* \*

MOTHER: While Mother is regularly visiting, it cannot be said there is a meaningful relationship with the child.  She is very bonded with the foster parents and her siblings.

(5) *The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition.*  BOTH PARENTS: The Court places great weight on this factor.  The only family this child has known is her foster family.  The foster parents love her unconditionally and want to adopt her and her siblings.  They have dramatically changed their lives for this child.  She is safe and secure.  The Court fears the outcome would be EXACTLY the same as the failed trial home visit if the [child] w[as] to return home at this point.  Mother's lack of a sustained period of sobriety prevents a healthy and safe environment with Mother.

(6) *Whether the parent or other person residing with the parent has shown brutality, physical, sexual emotional or psychological abuse or neglect toward the child or another child or adult in the family or household.*  BOTH PARENTS: The proof is clear there were many acts of serious domestic violence in the home between the parents.  They fought and argued a lot.  Mother admitted the children saw it.  Fortunately this child was removed before this could have a lasting effect on her.  The Court finds the likelihood the parents will be or are together to be great without addressing the underlying issue of domestic assault.

(7) *Whether the physical environment of the parent's home is healthy and safe.  Whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances as may render the parent consistently unable to care for the child is a safe and stable manner.*

\*        \*        \*

MOTHER: While Mother's home was physically safe, it is not just the bricks and mortar.  It is the unhealthy environment Mother is trapped in because of her substance abuse of (most recently) alcohol.  The Court has no trouble finding Mother is unable to care for this child at this time after over two years of continuous substance abuse treatment

- 19 -

and recent in-patient treatment.

(8) *Whether the parent's mental and/or emotional status would be detrimental to the child or prevent the parent from effectively providing safe and stable care and supervision for the child.*

\*     \*     \*

MOTHER: Mother has likely been self-medicating for years due to her anxiety and possibly undiagnosed mental illness. Even after a year of treatment, she has been unable to maintain sobriety. Her current regular alcohol use to the extent that she would come to court under the influence, tells the Court she is nowhere near ready mentally or emotionally to provide a safe home for the children.

(9) *Whether the parent has paid child support consistent with the child support guidelines.*

\*     \*     \*

MOTHER: Mother has been paying child support through wage assignment garnishment and income tax garnishment. She admits she owes some arrears but the amount is not significant.

(Emphasis in original.)

Balancing these statutory factors, and considering the situation from the child's perspective, the trial court concluded that termination of mother's parental rights is in the best interest of H.S.

The court appropriately placed "great weight" on factors (1) and (5). Factor (1) concerns mother's failure to make an adjustment of circumstance to the extent that returning the child would be safe. As the court noted, this factor is particularly relevant because mother's substance abuse was one of the primary reasons the child was removed in the first place. Although mother exchanged drugs for alcohol, mother continued to struggle with substance abuse throughout this case. Mother only obtained sobriety on the last day of trial and, at the time, it was unclear whether that adjustment would be a lasting one.

Factor (5) concerns the effect a change of caretakers would have on the child's

emotional, psychological and medical condition. The importance of this factor cannot be understated. H.S. has been in the custody of foster parents since she was three months old. She has a "deep bond" with her siblings and her foster parents, who she calls "mom" and "dad." Mother and father's parental rights to the three older children have already been terminated, and foster parents wish to adopt all four children. *See* ***In re Mariah H.***, No. E2016–02091–COA–R3–PT, 2017 WL 2829820, at *16 (Tenn. Ct. App., filed June 30, 2017) (holding that a change of caretakers would have an adverse effect on the child where "[t]he [c]hild has remained in the same foster home with two of her biological half-siblings since shortly after she was born" and "is bonded to the foster parents, who have expressed a desire to adopt her.").

As the trial court noted, the only best interest factors that weigh against termination of mother's parental rights are factors (3) and (9). Mother did pay child support and maintained consistent visitation with the child. However, visitation was always supervised and there was conflicting testimony as to whether the child recognized mother as her parent during those visits.

The evidence clearly and convincingly supports a finding that termination of mother's parental rights is in the best interest of the child. H.S. needs stability. H.S. also deserves to be permanently reunited with her three older siblings. We hope that mother will continue to seek appropriate treatment for her substance abuse and mental health issues. We also hope that mother will take appropriate steps to protect herself from domestic violence. It is not in the best interest of H.S., however, for this case to remain in limbo while mother pursues those goals.

## VI.

The judgment of the trial court is affirmed. The costs on appeal are assessed to the appellant, E.R. The case is remanded for enforcement of the trial court's judgment.

_____
CHARLES D. SUSANO, JR., JUDGE